**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN DEFENSE OF ANIMALS; DREAMCATCHER WILD HORSE AND BURRO SANCTUARY; BARBARA CLARKE; CHAD HANSON; LINDA HAY, *Plaintiffs-Appellants*, | No. 12-17804 D.C. No. 2:10-cv-01852-MCE-DAD |
| v. | OPINION |
| U.S. DEPARTMENT OF THE INTERIOR; BUREAU OF LAND MANAGEMENT; SALLY JEWELL,[*] Secretary of the U.S. Department of the Interior; NEIL KORNZE,[**] Director of the Bureau of Land Management; KEN COLLUM,[***] Field Manager of Eagle Lake Field Office, *Defendants-Appellees*, | |
| SAFARI CLUB INTERNATIONAL; SAFARI CLUB INTERNATIONAL FOUNDATION, *Intervenor-Defendants–Appellees*. | |

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, Chief District Judge, Presiding

Argued and Submitted
August 29, 2013—Pasadena, California

Filed May 12, 2014

Before:  Mary M. Schroeder, Johnnie B. Rawlinson,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea;
Dissent by Judge Rawlinson

---

* Sally Jewell is substituted for her predecessor, Kenneth L. Salazar, as Secretary of the Interior.  Fed. R. App. P. 43(c)(2).

** Neil Kornze is substituted for his predecessor, Robert Abbey, as Director of the Bureau of Land Management.  Fed. R. App. P. 43(c)(2).

*** Ken Collum is substituted for his predecessor, Dayne Barron, as Field Manager of Eagle Lake Field Office.  Fed. R. App. P. 43(c)(2).

## SUMMARY****

### Bureau of Land Management

The panel affirmed the district court's summary judgment in favor of federal defendants in an action alleging that the roundup, or gather, of wild horses and burros from the Twin Peaks Herd Management Area on the California-Nevada border violated the Wild Free-Roaming Horses and Burros Act and the National Environmental Policy Act.

Pursuant to its authority under the Wild Free-Roaming Horses and Burros Act (the "Act"), the Bureau of Land Management ("BLM") establishes Appropriate Management Levels for populations of native species - including wild horses and burros - and introduced animals, such as livestock. The BLM removes animals from the Herd Management Area when the population exceeds the established Appropriate Management Level.

The panel held that the BLM acted within its authority under the Act when it implemented the 2010 Gather Plan on the Twin Peaks Herd Management Area. The panel also held that the BLM's decision not to prepare an environmental impact statement under the National Environmental Policy Act ("NEPA") was not arbitrary and capricious because the BLM provided a convincing statement of reasons why the gather's environmental effects would not be significant. The panel also held that the BLM did not act arbitrarily and capriciously under NEPA when it responded to comments

**** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

highlighting the possibility of scientific dissent regarding the administration of the immunocontraceptive PZP.

Judge Rawlinson dissented because she did not agree that the roundup of the wild horses by the BLM complied with the Act.

## COUNSEL

Rachel M. Fazio, Cedar Ridge, California, for Plaintiffs-Appellants.

Ignacia S. Moreno, Assistant Attorney General; Nancy Zahedi, United States Department of the Interior, Office of Regional Solicitor; Erik E. Petersen, Ayako Sato, and Mark R. Haag, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., for Defendants-Appellees.

Douglas Scott Burdin and Anna Seidman, Safari Club International, Washington, D.C., for Intervenor-Defendants–Appellees.

## OPINION

BEA, Circuit Judge:

Wild horses—mustangs—and burros are part of our nation's heritage from the American West; a heritage Congress has sought to preserve. That these animals should roam the Western spaces appeals to the nature lover and historian in each of us.

But these animals eat and trample. Even in the wide open West of our nation, there is just so much forage; there are also many vulnerable cultural artifacts underfoot.

These animals also multiply. And when too many of them abound in limited land, the congressionally-appointed stewards of that land must act to protect the environment.

This case is about whether those stewards have followed Congress's rules and their own agency's regulations in acting to thin the herds of these sympathetic, even inspiring, but voracious, animals.

Plaintiffs—two non-profit organizations dedicated to protecting wild horses and burros, and members of these organizations—appeal the district court's grant of summary judgment to the United States Department of the Interior and the Bureau of Land Management ("BLM") (collectively "Defendants") regarding the roundup, or "gather," of approximately 1,600 wild horses and 160 burros from the Twin Peaks Herd Management Area ("HMA") on the California-Nevada border. Plaintiffs claim the gather violated the Wild Free-Roaming Horses and Burros Act ("the Act") and the National Environmental Policy Act ("NEPA"). The district court found no violation of either statute. We AFFIRM.

## Background

This case arises out of a roundup of wild horses and burros by the BLM. The roundup took place in August and September 2010 on the Twin Peaks HMA. In 1981, the BLM designated the Twin Peaks HMA—nearly 800,000 acres of public and private land on either side of the California-

Nevada border—as suitable for the long-term maintenance of wild horses and burros. Pursuant to its authority under the Act,[1] the BLM is charged with managing the Twin Peaks HMA to "achieve and maintain a thriving natural ecological balance." 16 U.S.C. § 1333(a). The BLM accomplishes this goal, in part, by establishing Appropriate Management Levels ("AMLs") for populations of both native species—including wild horses, burros, and other wildlife—and introduced animals, such as livestock (including cattle and sheep).[2] 43 C.F.R. § 4710.3-1. The BLM removes animals from an HMA when the population exceeds the established AML. Under the Act, the BLM must remove these excess animals in the following "order and priority": first, the BLM "shall order old, sick, or lame animals to be destroyed in the most humane manner possible"; second, the BLM "shall . . . capture[] and remove[]" additional excess animals "for private maintenance," including adoption; third, the BLM "shall . . . destroy[]" additional excess animals.[3] § 1333(b)(2).

---

[1] The Wild Free-Roaming Horses and Burros Act, 16 U.S.C. § 1331–1340, was enacted in 1971, and states its general purpose as protecting "wild free-roaming horses and burros [] from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331.

[2] There is a separate AML for each species on a given HMA. The AML for wild horses is defined by the BLM "as the number of wild horses that can be sustained within a designated HMA which achieves and maintains a thriving natural ecological balance in keeping with the multiple-use management concept for the area."

[3] As the district court noted, "Congress has never appropriated funds for extermination, as opposed to ongoing maintenance, of excess horses even if not adopted." *In Defense of Animals v. U.S. Dep't of the Interior*, 909 F. Supp. 2d 1178, 1190 (E.D. Cal. 2012); *see, e.g.*, Pub. L. 111-88,

In 1989, the BLM first set AMLs for wild horses and burros on the Twin Peaks HMA. Since then, it has adjusted these AMLs several times to address the degradation of riparian and wetland sites.[4] At the time of the 2010 gather, the AML amount for the Twin Peaks HMA was set at 448–758 wild horses and 72–116 burros. This amount was set in 2001 and was confirmed in the 2008 Eagle Lake Resource Management Plan.

Since 1998, the population of wild horses and burros on the Twin Peaks HMA has steadily increased despite nine BLM gathers and consequent removals. In May 2010, before the challenged gather, the HMA was home to approximately 2,303 wild horses and 282 burros, or close to 300% more wild horses and 240% more burros than the permissible highest number of their respective AMLs. At that time, the BLM projected that, if left unchecked, the wild horse population on the HMA could exceed 6,000 to 8,000 within ten years. Compounding this situation, according to the BLM, wild horses were consuming three to five times as much forage as was allocated for their use. The BLM predicted that, if left unchecked, this overpopulation of wild horses and burros would cause "serious impacts to soil stability, vegetation, water sources (springs and creeks), and wildlife habitat," and "would not allow for sufficient availability of forage and water for either wild horses or other

---

123 Stat. 2904, 2907 (2009) ("Appropriations herein made shall not be available for the destruction of healthy, unadopted, wild horses and burros in the care of the Bureau of Land Management or its contractors.").

[4] According to the BLM, "riparian and wetland sites" include both "lentic" and "lotic" sites. Lentic sites consist of springs and seeps. Lotic sites consist of creeks, streams, and reservoirs.

animals."  The BLM also noted that the "increased numbers of wild horses over the past five years appear[ed] to be having a significant adverse impact [on cultural] sites."[5]

In May 2010, after soliciting comments from 250 sources, and based in part on the BLM's stated predictions, the BLM released a 157-page Environmental Assessment ("EA") for its Twin Peaks HMA Wild Horse and Burro Gather Plan ("Gather Plan").  "To reduce the impacts associated with an overpopulation of wild horses [and to] ensure that rangeland and riparian resources are capable of meeting land health standards," the EA proposed to remove excess wild horses and burros from the HMA.  The EA noted that the proposed action was "needed at this time to balance wild horse and burro populations with other resources, including wildlife habitat, wilderness study area values, cultural resources, livestock grazing, and soil and vegetation resources."

According to the proposed action analyzed by the EA, the BLM would attempt to gather up to 2,300 wild horses and 210 burros from the Twin Peaks HMA and would then return a certain number of both animals to the HMA such that the total remaining populations were within the designated AMLs.  The BLM planned to use "a helicopter drive method of capture, with occasional helicopter assisted roping from horseback" to steer the animals into "trap sites" where the animals would be held until they could be transported to temporary holding facilities on the HMA.  Once in the

---

[5] "Cultural sites" refer to areas and artifacts which reflect the Twin Peaks' American Indian history.  The BLM has estimated that over 1,500 such cultural sites exist within the Twin Peaks HMA, including tool-stone quarries, prehistoric camp sites and rockshelters, petroglyphs (rock drawings), and trails.

temporary holding facilities, the BLM would feed the animals, sort them based on sex, and examine the animals' conditions before deciding whether individual animals should be euthanized because of injury or age, put up for adoption, or returned to the HMA.[6]    To curb future population increases, the released wild horses would have a 60:40 studs-to-mares (male-to-female) ratio, and the released mares would be injected with an immunocontraceptive, Porcine Zona Pellucida ("PZP"), which would reduce their fertility for two years.

The EA described the actions the BLM would take to ensure the helicopter gather process would not unnecessarily stress the animals and maintained that the capture methods, traps, holding facilities, equipment, safety procedures, and administration of PZP would comply with the BLM's Standard Operating Procedures for such gathers. The EA also provided a detailed analysis of an alternative gather plan that would not involve any fertility control measures, an alternative that would use only fertility control measures but no herd thinning or relocation, and a no-action alternative.[7] The EA examined the potential impacts of these alternatives on the HMA's environment, looking specifically at the impact on areas of critical environmental concern, cultural

---

[6] Remember, although the Act authorizes the "humane" destruction of excess healthy wild horses and burros, Congress has prohibited the authorization of funds to be spent to do so. *See supra* n.3. If not adopted, BLM transfers the healthy excess animals to private long-term holding facilities, which consist of grassland pastures in the Midwest averaging approximately 10–11 acres per horse.

[7] The EA also gave brief consideration to fourteen additional alternatives, which the BLM concluded were either impracticable or unresponsive to the need to remove excess animals.

resources, livestock grazing, noxious weeds and invasive species, riparian and wetland sites, soil resources, special status plants, upland vegetation, native wildlife, and wilderness study areas.

In July 2010, based on its detailed consideration in the EA, the BLM issued a "Finding of No Significant Impact" ("FONSI") on the environment for the proposed gather from the Gather Plan, and therefore did not prepare an environmental impact statement ("EIS").[8] On the same day, the BLM announced that it would implement the proposed gather and also responded to comments it had received on the EA.

Before the BLM conducted the proposed gather, Plaintiffs filed suit against the Defendants to enjoin implementation of the proposed gather. Plaintiffs alleged the proposed gather would violate the Act and the EIS-requirement of NEPA. The district court denied Plaintiffs' motion for a preliminary injunction, and Plaintiffs appealed.

After a motions panel of this court denied an emergency motion for injunctive relief pending appeal on August 10, 2010, the gather took place during August and September of 2010. The BLM ultimately gathered approximately 1,639 wild horses and 160 burros. The parties agree that post-

---

[8] As discussed in more detail *infra* Part B, NEPA requires an agency to complete an EIS only when substantial questions are raised as to whether a proposed project "may cause significant degradation of some human environmental factor." *Pub. Citizen v. Nuclear Regulatory Comm'n*, 573 F.3d 916, 929 (9th Cir. 2009) (quoting *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1219 (9th Cir. 2008)).

gather, 793 wild horses and 160 burros resided on the HMA.[9] The remaining wild horses were made available for adoption or sale, or placed in long-term holding facilities.

On August 15, 2011, this panel denied Plaintiffs' preliminary injunction appeal because the injunctive relief sought had become moot. *In Defense of Animals v. U.S. Dep't of Interior*, 648 F.3d 1012 (9th Cir. 2011). The parties then filed cross motions for summary judgment in the district court. The district court granted Defendants summary judgment, holding that the gather did not violate the Act or NEPA. Plaintiffs timely appealed.

### Standard of Review

This court reviews de novo a grant of summary judgment. *Guatay Christian Fellowship v. Cnty. of San Diego*, 670 F.3d 957, 970 (9th Cir. 2011). We "must determine, viewing the evidence in the light most favorable to the nonmoving party, whether the district court correctly applied the relevant substantive law and whether there are any genuine issues of material fact." *Balint v. Carson City*, 180 F.3d 1047, 1050 (9th Cir. 1999) (en banc).

Because neither NEPA nor the Act contain an internal standard of judicial review, the Administrative Procedure Act governs this court's review of the BLM's actions. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 858–59 (9th Cir. 2005). This court must set aside the BLM's actions, findings, or conclusions if they are "arbitrary,

---

[9] According to the BLM, fifty-eight horses and one burro were returned to the Twin Peaks HMA after the gather and two horses were euthanized on the HMA due to pre-existing, debilitating leg injuries.

capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although this review is "searching and careful," the arbitrary and capricious standard is narrow, and this court cannot substitute its own judgment for that of the agency. *Ocean Advocates*, 402 F.3d at 858 (citation omitted). An agency's decision is arbitrary and capricious if it fails to consider important aspects of the issue before it, if it supports its decisions with explanations contrary to the evidence, or if its decision is either inherently implausible or contrary to governing law. *The Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005).

## Analysis

### A.  Plaintiffs' Wild Free-Roaming Horses and Burros Act claims

The Act directs the Secretary of the Interior ("Secretary") to "protect and manage wild free-roaming horses and burros as components of the public lands . . . ." 16 U.S.C. § 1333(a). The BLM, as the designate of the Secretary, "shall manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." *Id*. The BLM must also "maintain a current inventory of wild free-roaming horses and burros on given areas of the public lands." § 1333(b)(1). As Congress explained:

> The purpose of such inventory shall be to: make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals; determine appropriate management levels of wild free-roaming horses and burros on these

areas of the public lands; and determine whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels).

*Id*.

Congress provided that "[a]ll management activities shall be at the minimal feasible level . . . ." § 1333(a). Yet the Act also provides that if the current population inventory reveals that "an overpopulation exists on a given area of the public lands," and if the BLM determines that "action is necessary to remove excess animals," the BLM "shall immediately remove excess animals from the range so as to achieve appropriate management levels." § 1333(b)(2). The Act defines "excess animals" as "wild free-roaming horses or burros . . . which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." § 1332(f). Thus, while the overarching purpose of the Act is to protect wild horses and burros from "capture, branding, harassment or death," § 1331, the BLM is *required* to remove wild horses and burros from a given area of the public lands when an overpopulation exists.

In removing "excess animals," the Act instructs the BLM to take action

in the following *order and priority*, until all excess animals have been removed so as to restore a thriving natural ecological balance to

the range, and protect the range from the deterioration associated with overpopulation:

(A) The Secretary shall order old, sick, or lame animals to be destroyed in the most humane manner possible;

(B) The Secretary shall cause such number of additional excess wild free-roaming horses and burros to be humanely captured and removed for private maintenance and care for which he determines an adoption demand exists . . . ;

(C) The Secretary shall cause additional excess wild free-roaming horses and burros for which an adoption demand by qualified individuals does not exist to be destroyed in the most humane and cost efficient manner possible.

§ 1333(b)(2) (emphasis added).

Plaintiffs make five arguments why the BLM violated the Act by implementing the proposed gather, but none of these arguments prevail.

First, Plaintiffs claim the BLM failed to determine, before the gather, that there were "excess" wild horses and burros on the Twin Peaks HMA. However, as earlier noted, the BLM had set AMLs for wild horses and burros on the HMA through the 2008 Eagle Lake Resource Management Plan at 448–758 and 72–116, respectively, and determined, prior to the gather, that these AMLs had been vastly exceeded. In the

EA, the BLM specifically found that there were 1,855 excess wild horses and 210 excess burros within the HMA.[10]  Given the undisputed fact that the wild horse and burro populations greatly exceeded their respective AMLs at the time of the gather, and the carefully-documented concerns about the deterioration of riparian areas and cultural sites caused by overpopulation, as well as the likelihood of insufficient forage to sustain the growing herd,[11] the BLM properly decided action was necessary to restore the AMLs.[12]

---

[10] This careful determination of AMLs for the wild horses and burros, and the calculation of the excess population, distinguishes this case from *Colorado Wild Horse and Burro Coalition v. Salazar*, 639 F. Supp. 2d 87 (D.D.C. 2009).  In *Salazar*, the BLM proposed the permanent removal of the entire wild horse herd from the West Douglas Herd Area in Colorado, but failed to establish an AML for the herd or to demonstrate that there were excess numbers of wild horses on the public lands. *Id.* at 95.  A non-profit organization challenged the proposed gather as violative of the Act's requirement that the BLM keep an inventory of wild horses on public lands and determine that there are excess animals before removing them. *Id*. at 89.  The district court agreed and held that the proposed gather, which had been planned without any determination that an overpopulation existed or that there were excess wild horses on the public lands, violated the Act. *Id*. at 98.  Here, to the contrary, the BLM fulfilled its statutory duty by keeping an inventory of wild horse and burro populations on the Twin Peaks HMA and making detailed calculations of the excess animals on the HMA.

[11] Indeed, in its decision to implement the Gather Plan, the BLM predicted that if no action were taken to restore the AMLs, the wild horse population would "crash . . . based on a lack of forage and water, and from extreme competition and stress to the animals."

[12] According to the EA, some riparian/wetland areas were "not meeting the [Riparian Proper Functioning Condition] standard" in May 2010 because of "[h]igh utilization and trampling by excess numbers of wild horses."  Moreover, "many [riparian/wetland] sites appear[ed] to be in a downward trend and [were] at risk of becoming more severely degraded

Plaintiffs claim that, to find that there were "excess animals," the BLM was required to determine that there was not a "thriving natural ecological balance" on the HMA due to the presence of wild horses and burros at the time of the gather. Plaintiffs cite 16 U.S.C. § 1332(f)(2), which defines "excess animals" as those animals which "must be removed from an area in order to preserve and maintain a thriving natural ecological balance . . . ." This argument fails. Preservation efforts can hardly require prior destruction of what is to be preserved. Simply because removal is required when necessary to "preserve and maintain" such a "thriving natural ecological balance" does not mean that removal can occur *only* when there is a showing that such a balance no longer exists. Rather, the use of the phrase "preserve and maintain" in the definition of "excess animals" suggests that the BLM may determine removal is necessary to ensure that the current thriving natural ecological balance does not deteriorate in the future.

Additionally, as the district court held, the statute determines "excess animals" through the use of AML levels. *In Defense of Animals v. U.S. Dep't of Interior*, 909 F. Supp. 2d 1178, 1192 (E.D. Cal. 2012); 16 U.S.C. § 1333(b)(2) (if "an overpopulation exists," and if the BLM determines that "action is necessary to remove excess animals," the BLM "shall immediately remove excess animals from the range *so as to achieve appropriate management levels*.") (emphasis added). Although the statute also provides that "[s]uch action shall be taken . . . until all excess animals have been removed

---

if [the then-current] level of use from wild horses [was] not curtailed." Finally, the BLM determined that "[t]he increased numbers of wild horses over the past five years appear[ed] to be having a significant adverse impact to [cultural] sites."

*so as to restore a thriving natural ecological balance*," the most logical reading of those two phrases together is that the BLM must achieve a "thriving natural ecological balance" by maintaining the relevant AMLs.  § 1333(b)(2).  In this way, "AML is a vehicle used to move towards a [thriving natural ecological balance], and a trigger by which [] the BLM is alerted to address population imbalance."  *In Defense of Animals*, 909 F. Supp. 2d at 1192; *see also Am. Horse Protection Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1318 (D.C. Cir. 1982) (The Act "directs that horses 'shall' be removed 'immediately' once the Secretary determines, on the basis of whatever information he has at the time of his decision, that an overpopulation exists.") (emphasis omitted).  Thus, the BLM correctly relied on the AMLs to decide that there were excess wild horses and burros on the HMA, and Plaintiffs' assertion that a "thriving natural ecological balance" was being maintained on the Twin Peaks HMA before the gather is irrelevant.[13]

Second, Plaintiffs contend the BLM violated the "order and priority" provision of the Act, 16 U.S.C. § 1333(b)(2),[14]

---

[13] Although Plaintiffs fault the BLM for relying on "decade-old" AMLs from 2001without conducting a new analysis, the 2008 Eagle Lake Resource Management Plan "validated" those AMLs. Regardless, nothing in the Act requires the BLM to determine new AMLs based on current conditions every time the BLM decides to take action to restore the already-established AMLs.

[14] Section 1333(b)(2) provides, in relevant part:

> Where the Secretary determines . . . that an overpopulation exists on a given area of the public lands and that action is necessary to *remove* excess animals, he shall immediately *remove* excess animals from the range so as to achieve appropriate

by failing to identify and euthanize the "old, sick, or lame" animals on the HMA *before* "capturing" or "removing" the adoptable horses and burros.  The BLM responds that the term "remove" in § 1333(b)(2) should be interpreted to refer to the permanent removal of animals from the HMA, and not the temporary gathering of animals on the HMA to determine which animals should be euthanized and which animals should be made available for adoption.  The BLM therefore claims that "the Gather Plan's *temporary* gathering of animals *on the* [*HMA*] is not itself a removal and is therefore not governed by Section 1333(b)(2)'s order and priority provision."  We agree with the BLM.

The Act does not define "remove" as it is used in § 1333(b)(2) to prescribe the order for removal of excess wild horses and burros.  However, the Act does direct the BLM to

---

management levels.  Such action shall be taken, in the following order and priority, until all excess animals have been *removed* . . .

(A) The Secretary shall order old, sick, or lame animals to be destroyed in the most humane manner possible;

(B) The Secretary shall cause such number of additional excess wild free-roaming horses and burros to be humanely captured and removed for private maintenance and care for which he determines an adoption demand exists . . . ;

(C) The Secretary shall cause additional excess wild free-roaming horses and burros for which an adoption demand by qualified individuals does not exist to be destroyed in the most humane and cost efficient manner possible.

(emphasis added).

"immediately remove excess animals *from* the range."
§ 1333(b)(2) (emphasis added).  Moreover, none of the three
methods for removal provided for by the "order and priority"
provision (euthanization of old, sick, or lame animals; private
maintenance; and destruction of additional excess animals)
contemplate "removal"of the animals by temporarily
capturing those animals on the HMA.  Therefore, we interpret
the term "remove" in § 1333(b)(2) to mean the transfer of
wild horses and burros from the public lands on which they
once lived to private lands for private maintenance, or the
destruction of such animals pursuant to § 1333(b)(2)(A) or
(C).[15]    Under this interpretation, the gather's temporary
roundup of nearly all the wild horses and burros on the HMA
was not itself a "removal" that is governed by the order and
priority provision of the Act, and therefore the BLM did not
violate this provision.  *See In Defense of Animals v. Salazar*,
675 F. Supp. 2d 89, 97 (D.D.C. 2009) (holding that rounding
up the vast majority of a wild horse herd for sorting in a
nearby holding facility does not "remove" all horses from the
public lands in violation of the Act's order and priority
provision).

In sum, the BLM's actions fell within the discretion
which courts have recognized the BLM has to remove excess

---

[15] In the EA, the BLM interpreted "remove" to refer to the permanent
removal of the animals from the HMA, while it used the term "gather" to
describe the temporary herding and holding of the animals for purposes of
identification and diagnosis.  We need not determine what, if any, level of
deference this determination is due because we have concluded that the
plain language of the statute is not ambiguous.  *See*, *Chevron, U.S.A., Inc.
v. Natural Res. Def. Council*, *Inc.*, 467 U.S. 837, 842 (1984) ("If the intent
of Congress is clear, that is the end of the matter.").

animals from an HMA.[16]  When faced with the task of having to remove a large percentage of the wild horse and burro population to maintain the AMLs, the BLM reasonably determined that the most effective way to fulfill its statutory mandate was to attempt temporarily to gather the entire herd before making determinations as to which animals should be euthanized, which animals should be permanently removed via adoption, and which animals should be released back on to the HMA.[17]

Third, Plaintiffs argue that because the gather will likely result in a level of livestock grazing that is allegedly three times higher than the level of wild horse and burro grazing, the gather violated the Act's purported  mandate that the Twin Peaks HMA be managed "principally but not necessarily exclusively" for the welfare of wild horses and burros.  Plaintiffs rely on language in the Act which defines "ranges," which are to be designated by the Secretary as "sanctuaries for the protection and preservation" of wild horses and burros, *see* 16 U.S.C. § 1333(a), as "the amount of land . . . which is devoted principally but not necessarily

---

[16] *See, e.g.*, *Cloud Found., Inc. v. Kempthorne*, 2008 WL 2794741, at *11 (D. Mont. July 16, 2008) ("The BLM has broad discretion under the Act, and the arbitrary and capricious standard of review from the APA is highly deferential"); *Am. Horse Protection Ass'n v. Frizzell*, 403 F. Supp. 1206, 1217 (D. Nev. 1975) (denying motion for a preliminary injunction, permitting roundup of 400 wild horses to go forward, and noting the BLM is given a "high degree of discretionary authority for the purposes of protection, management, and control of wild free-roaming horses and burros on the public lands") (citation omitted).

[17] Plaintiffs' related argument that the BLM impermissibly removed *non-excess* wild horses from the HMA when it temporarily gathered nearly all of the animals fails because we hold that the initial temporary roundup on the HMA did not constitute a "removal" under the Act.

exclusively to" wild horse and burro welfare, *see* § 1332(c). We need not determine whether the gather violated these provisions of the Act because the record is bereft of an essential foundational fact—designation of the Twin Peaks HMA as a "range" by the Secretary pursuant to § 1333(a).[18] According to the BLM's summary of public comments for the Gather Plan, the Twin Peaks HMA has not been designated a "wild horse and burro *range*" by the Secretary, nor have Plaintiffs presented any evidence suggesting that the Twin Peaks HMA has been so designated.  Therefore, any requirements that might stem from the definition of "range" in the Act do not apply to the Twin Peaks HMA.

Fourth, Plaintiffs argue that the BLM violated the Act's mandate that the BLM manage horses and burros at a "minimal feasible level" when the BLM "decided to chase with helicopters and capture up to 100% of the wild horses from the Twin Peaks HMA, remove[] about 80% [of the herd], inject mares with immunocontraceptives, and unnaturally skew the sex ratio."  The Act does provide that "[a]ll management activities shall be at the minimal feasible level . . . ."  16 U.S.C. § 1333(a).  But Plaintiffs do not adequately take into account the full statutory language, which provides that "[a]ll management activities shall be at the minimal feasible level and shall be carried out . . . *in order to protect the natural ecological balance of all wildlife species which inhabit such lands* . . . ."  § 1333(a) (emphasis added).  Given BLM's determination that the overpopulation

---

[18] Agency regulations distinguish between "herd management areas," such as the Twin Peaks HMA, which need not be managed "principally but not necessarily exclusively" for the welfare of wild horses and burros and "wild horse and burro ranges" which must be so managed.  *See* 43 C.F.R. § 4710.3-1, 4710.3-2.

of wild horses and burros threatened the natural ecological balance on the HMA, it reasonably determined that the gather was necessary to restore the AMLs and thereby protect the HMA's natural ecological balance.

Moreover, the BLM had simultaneous duties not only "to achieve and maintain a thriving natural ecological balance" on the HMA, § 1333(a), but also to remove excess animals "immediately" when the BLM determined "that an overpopulation exist[ed]." § 1333(b)(2). Congress could not have intended that the "minimal" management requirement would force the BLM to ignore these other statutory mandates. Given that this court must defer to the BLM's expertise under the APA, *see Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994), we hold that the BLM reasonably interpreted its statutory directive that management be at a "minimal feasible level" when it decided to implement the Gather Plan in light of the overpopulation at the time of the gather and the fact that inaction would have led only to further detrimental population increases.[19]

---

[19] Given the rapid population growth, the district court also reasoned that the BLM's "efforts to slow reproduction . . . through immunocontraceptives administered to released mares, and through a skewed sex ratio of mares to stallions, is [] within the Act's purview . . . ." On appeal, Plaintiffs claim that Alternative B to the proposed gather plan, which called for removing excess horses without fertility controls, would have achieved the same result but with less impact. However, the EA concluded that without population controls, the wild horse population would grow at a faster rate and more animals would need to be removed in the future to maintain the AMLs. As the district court correctly reasoned, the BLM's chosen action constitutes management at the "minimal" feasible level because the gather was intended to reduce the size and frequency of future gathers. *In Defense of Animals*, 909 F. Supp. 2d at 1194.

Fifth, Plaintiffs incorrectly argue that the storage of unadoptable excess wild horses at long-term holding facilities owned by private contractors violated the Act.  While the Act does prohibit the BLM from relocating wild horses and burros "to areas of the *public* lands where they do not presently exist," the Act does not prohibit such relocation to *private* lands.  16 U.S.C. § 1339 (emphasis added).  Because nothing in the Act suggests that Congress intended to bar the relocation of unadoptable horses to private lands for long-term holding, we decline to read such a prohibition into the Act.[20]

Plaintiffs also contend that the privately-owned holding facilities housing excess animals are "public lands" because the Act defines "public lands" as "any lands *administered* by the Secretary of the Interior through [the BLM]."  16 U.S.C. § 1332(e) (emphasis added).  Plaintiffs claim the BLM

---

[20] Moreover, as the D.C. Circuit has explained, "[s]ilence . . . may signal permission rather than proscription," and can suggest that Congress has left a "question to agency discretion."  *Catawba Cnty., N.C. v. EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009) (citations and internal quotation marks omitted).  Here, the BLM's interpretation of the statute—that unadoptable horses may be relocated to private lands for long-term holding—deserves deference precisely because of the "gap" Congress has left in the statute.  *See Schneider v. Chertoff*, 450 F.3d 944, 960 (9th Cir. 2006).  Congress has barred the BLM from euthanizing healthy excess horses for which there is no adoption demand pursuant to 16 U.S.C. § 1333(b)(2)(C) by continually declining to appropriate funds for the destruction of these animals.  *See, e.g.*, Pub. L. No. 111-88, 123 Stat. 2904, 2907 (2009) ("Appropriations herein made shall not be available for the destruction of healthy, unadopted, wild horses and burros in the care of the Bureau of Land Management or its contractors.").  Thus, the BLM properly determined that relocation of these animals to private facilities for long-term holding is necessary because the Act simultaneously mandates that the BLM remove "excess" horses immediately to maintain the established AMLs.  *See* 16 U.S.C. § 1333(b)(2).

"administers" these facilities by exercising oversight over the lands, thereby converting the facilities into "public lands" to which excess animals may not be transferred. This argument fails. To "administer" means "to manage or conduct." *Black's Law Dictionary* 65 (4th ed. 1968); *Af–Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1088 (9th Cir. 2007) ("When determining the plain meaning of language, we may consult dictionary definitions."). Although Plaintiffs cite a memo which suggests that two BLM officers inspected the wild horses in one long-term holding facility by counting the number of horses and observing their conditions, such isolated references to the BLM's oversight practices do not establish that the BLM "manages or conducts" the land on which the animals reside. On the contrary, the evidence suggests that the private land-owners, not the BLM, "administer" the lands because they effectuate the direct day-to-day operations on the land.[21]

We therefore hold that the BLM did not violate the Act by implementing the 2010 gather on the Twin Peaks HMA.

---

[21] While plaintiffs argue that transfer of the horses to long-term holding facilities is contrary to Congress's intent to allow these horses to remain "wild and free-roaming," the district court rebutted this point by noting how "transfer to the private facilities . . . would appear to be far more consistent with that [wild and free-roaming] behavior than the other options for disposing of excess horses and burros contemplated by the Act; namely, adoption, euthanasia, or commercial sale." *In Defense of Animals*, 909 F. Supp. 2d at 1194 n.7. Indeed, the record indicates that the grassland pastures at the private facilities average approximately 10–11 acres per animal.

## B.  Plaintiffs' NEPA claims

Plaintiffs also appeal the district court's holding that the BLM did not violate the National Environmental Policy Act ("NEPA").  *In Defense of Animals*, 909 F. Supp. 2d at 1198. Plaintiffs contend that the BLM violated NEPA by declining to prepare an environmental impact statement ("EIS") and failing to respond adequately to scientific evidence regarding the adverse effects of the immunocontraceptive PZP.

NEPA, 42 U.S.C. §§ 4321–4370, requires certain procedural safeguards before an agency takes an action that may significantly affect the environment.   In particular, NEPA requires federal agencies to prepare an EIS that discusses the environmental ramifications for "major Federal actions significantly affecting the quality of the human environment."[22]  42 U.S.C. § 4332(2)(C).  To decide whether an EIS is required because the agency's action "significantly affect[s] the quality of the human environment," an agency may first prepare an Environmental Assessment ("EA"), which is a "concise public document" that must "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS]."  40 C.F.R. § 1508.9(a)(1); *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).  When substantial questions are raised as to whether a proposed project "may cause significant degradation of some human environmental factor," an EIS is

---

[22] 40 C.F.R. 1508.14 provides that the term "[h]uman environment shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment."  In the context of wild horse gathers, this court has interpreted "human environment" to encompass "not solely [the environmental impact] on the rangelands, but [the environmental impact] on the horses as well."  *Am. Horse Protection Ass'n v. Andrus*, 608 F.2d 811, 814 (9th Cir. 1979).

required.   *Pub. Citizen v. Nuclear Regulatory Comm'n*, 573 F.3d 916, 929 (9th Cir. 2009) (quoting *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1219 (9th Cir. 2008)).

If an agency determines an EIS is not required, it must, as did the BLM here, issue a Finding of No Significant Impact ("FONSI"), briefly describing why the action "will not have a significant effect on the human environment . . . ."   40 C.F.R. § 1508.13.   In reviewing a decision not to prepare an EIS under NEPA, the reviewing court "employ[s] an arbitrary and capricious standard that requires us to determine whether the agency has taken a 'hard look' at the consequences of its actions, based [its decision] on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant."   *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.* ("*EPIC*"), 451 F.3d 1005, 1009 (9th Cir. 2006) (citation and internal quotation marks omitted).   In making this assessment, we must not "substitute our judgment for that of the agency."   *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 473 (9th Cir. 2000).

Agencies consider two broad factors to determine whether an action may "significantly affect" the environment: "context" and "intensity."   40 C.F.R. § 1508.27; *see also Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2757 (2010).   "Context simply delimits the scope of the agency's action, including the interests affected."   *Babbit*, 241 F.3d at 731.   Intensity refers to the "severity of impact," and the regulations identify ten factors that agencies should consider

in evaluating intensity.    § 1508.27(b)(1)–(10) (listing factors).[23]

## 1.  The BLM's decision not to prepare an EIS

The BLM's 157-page Gather Plan EA, published in May 2010, reveals a detailed consideration of the then-current and future status of riparian areas, cultural sites, native wildlife, and wild horse and burro populations on the Twin Peaks HMA.  The EA based its conclusions on evaluations of the condition and health of riparian sites between 1995 and 2009 performed by BLM specialists who could determine the extent of damage caused by wild horses and burros, as opposed to livestock and other factors.  The report included photos of affected sites and predictions of how the gather would improve at least 80 riparian and cultural sites currently damaged by wild horse trampling.

---

[23] The "intensity" factors enumerated by § 1508.27(b) include: (1) "Impacts that may be both beneficial and adverse"; (2) "The degree to which the proposed action affects public health or safety"; (3) "Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas"; (4) "The degree to which the effects on the quality of the human environment are likely to be highly controversial"; (5) "The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks"; (6) "The degree to which the action may establish a precedent for future actions . . . "; (7) "Whether the action is related to other actions with individually insignificant but cumulatively significant impacts"; (8) "The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources"; (9) "The degree to which the action may adversely affect an endangered or threatened species or its habitat . . . "; and (10) "Whether the action threatens a violation of Federal, State, or local law . . . ."

The EA also described the actions that would be taken to ensure the helicopter gather process would not unnecessarily stress the animals, and made clear that the capture methods, traps, holding facilities, equipment, and administration of immunocontraceptives would be in compliance with the Standard Operating Procedures set out in the National Wild Horses Gather Contract.   The EA provided a thorough analysis of numerous alternatives, including an alternative that would not involve any fertility control measures, an alternative that would use only fertility control measures, and a no-action alternative.  In short, the EA provided a detailed analysis of the current environmental conditions on the HMA, future projections for the environmental condition of the HMA absent any action, an explanation of the BLM's preferred action in comparison to alternative actions that the BLM could take, and the methodology and data upon which its conclusions were based.

Relying on this comprehensive analysis, the BLM's FONSI determined that the proposed gather would "not significantly affect the quality of the human environment." The FONSI therefore concluded that the proposed gather was "not a major federal action" for which an EIS would be required.   That conclusion was supported by a brief but persuasive analysis of the ten intensity factors enumerated by 40 C.F.R. § 1508.27(b).  *See supra* n.23.  In particular, the FONSI incorporated the 27-page environmental "effects" analysis contained in the EA; noted that standard operating procedures would be used to conduct the gather; emphasized that the proposed action was not likely to affect public health or safety because the Twin Peaks HMA "is located within a very remote setting with little human habitation"; determined that "cumulative effects expected would include continued improvement of upland and riparian vegetation conditions";

stated there are no threatened or endangered plants in the surrounding area; and maintained that a cultural resources survey of the HMA would occur before the gather and would guide the choice of temporary trap sites.  Plaintiffs challenge the BLM's decision not to issue an EIS, citing four of the intensity factors from 40 C.F.R.§ 1508.27(b) for their argument that substantial questions have been raised regarding whether the gather may have a significant impact on the wild horses and burros of the HMA.

First, Plaintiffs claim the effects of the gather were "highly controversial." *See* 40 C.F.R. § 1508.27(b)(4) (listing as an intensity factor "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial").  An action is "highly controversial" when "a substantial dispute exists as to the size, nature, or effect of the major federal action[.]"  *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1057 (9th Cir. 2010).  "A substantial dispute exists when evidence . . . casts serious doubt upon the reasonableness of an agency's conclusions."  *Babbitt*, 241 F.3d at 736.  Plaintiffs claim the gather was "highly controversial" because of its "unprecedented" scope. According to Plaintiffs, "[n]one of the previous roundups [on the Twin Peaks HMA] included intensive manipulations of the horses left on the range [such as injection of immunocontraceptives into the mares and the skewing of the stallion-to-mare ratio], and all of [the previous gathers] rounded up a much smaller percentage of the overall population [of wild horses and burros]."

Plaintiffs are correct that the challenged gather was the largest ever conducted on the Twin Peaks HMA, as the BLM concedes.  The BLM gathered approximately 1,639 wild horses, almost double the number taken in the previous gather

of wild horses.  Plaintiffs are also correct that some 2,300 public comments were submitted opposing the Gather Plan EA.

These considerations notwithstanding, if any opposition to an agency's proposed actions created a "substantial dispute," an EIS would seemingly always be required.  *Cf. Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005) (stating that the mere "existence of opposition to a use" does not render a project "highly controversial").  Even granting that this was the largest gather ever conducted on the HMA, its foreseeable effect was entirely precedented and non-controversial: the return of the wild horse and burro populations to the long-established AMLs.  Indeed, the effects of gathers conducted on the Twin Peaks HMA are well known to the BLM, as the BLM has gathered animals on these lands since 1976 and gathered approximately 4,000 wild horses on the HMA between 1998 and 2009.  As for Plaintiffs' contention regarding the injection of immunocontraceptives into mares and the skewing of the stallion-to-mare ratio, these practices have been in use since at least 1992, and the comments on the EA do not indicate that these practices are "highly controversial." Overall, given the EA's clear and lengthy analysis regarding the effects of the proposed gather, Plaintiffs have not presented evidence that "casts serious doubt upon the reasonableness of [the] agency's conclusions," and thus the effects of the gather were not "highly controversial" at the time the BLM issued its FONSI.  *See Locke*, 626 F.3d at 1057.

Second, Plaintiffs assert that the gather's "possible effects . . . on the wild horses and burros in this HMA are highly uncertain and/or involve unique or unknown risks."  *See* 40

C.F.R. § 1508.27(b)(5) (listing as an intensity factor "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks").  Plaintiffs cite two studies that claim to demonstrate that the use of immunocontraceptives such as PZP may have "potentially significant effects" on wild horses.  Plaintiffs also claim the gather's combination of PZP treatment with a large reduction in herd size and the skewing of the herd's sex ratio resulted in a high degree of uncertainty.

This argument fails because "regulations do not anticipate the need for an EIS anytime there is some uncertainty, but only if the effects of the project are 'highly' uncertain." *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 712 (9th Cir. 2009) (citation and internal quotation marks omitted).  The effects of the gather were not "highly uncertain" to the BLM, which, as noted above, has used PZP to manage wild horse populations since 1992 and has made adjustments to herd sex ratios in numerous gathers.  And Plaintiffs have submitted no evidence in support of their assertion that the *combination* of these practices may actually pose serious unknown risks.

Plaintiffs' strongest argument regarding the "highly uncertain" intensity factor is their citation of two studies (a study by Cooper and Larsen from 2006 and a study by Nunez *et al.* from 2009) that discuss possible negative effects PZP may have on the herd behavior and genetic diversity of wild horse populations.  However, these two articles are ultimately insufficient to require a full EIS in a case like this where the agency relied on other scientific findings to support its conclusion that PZP would not have a significant negative effect on the animals.  *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) ("When specialists express

conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.") Moreover, the district court correctly noted that the studies cited by Plaintiffs found only "possible" effects of PZP, and "therefore can be distinguished on that basis [from the studies on which the BLM relied in its EA] since effects that are only 'possible' do not represent true 'dissenting' views." *In Defense of Animals*, 909 F. Supp. 2d at 1197.[24] Some wild horse protection groups even commented on the EA that the BLM should make *greater* use of contraceptive treatments.  This court has held that when an agency bases a finding of no significant impact upon relevant and substantial data, the fact that the record also contains some evidence supporting a different scientific opinion does not necessarily render the agency's decision arbitrary and capricious.  *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1333 (9th Cir. 1992).  We therefore decline to find that the effects of the proposed gather were "highly uncertain."

Third, Plaintiffs claim the gather will "establish a precedent for future actions with significant effects," by encouraging future roundups of this scope and intensity. *See* 40 C.F.R. § 1508.27(b)(6) (listing as an intensity factor "[t]he degree to which the action may establish a precedent for future actions with significant effects").   However, this argument is foreclosed by Ninth Circuit law which holds that "EAs are usually highly specific to the project and the locale, thus creating no binding precedent." *Barnes v. U.S. Dep't of*

---

[24] The district court also distinguished the studies cited by Plaintiffs on the ground that those studies assessed the effects on wild horses of repeated doses of PZP, whereas the Gather Plan only proposed to administer a single dose. *In Defense of Animals*, 909 F. Supp. 2d at 1197.

*Transp.*, 655 F.3d 1124, 1140 (9th Cir. 2011) (citation omitted). Thus, the BLM's finding of no significant impact in this case will not affect the BLM's NEPA analysis in future gathers.[25]

We conclude that the BLM considered the relevant intensity factors in making its finding of no significant impact and "provided a convincing statement of reasons to explain why [the] project's impacts [were expected to be] insignificant." *EPIC*, 451 F.3d at 1009 (citation and internal quotation marks omitted). Therefore, the BLM did not violate NEPA when it decided not to issue an EIS.

## 2. The BLM's response to contrary scientific evidence

Finally, Plaintiffs argue that the BLM failed to respond adequately to opposing scientific views regarding potential negative effects of the immunocontraceptive PZP, once again citing the Cooper and Larsen (2006) and Nunez *et al.* (2009) studies. In response to a comment on the EA that drew the BLM's attention to these studies, the BLM simply directed readers to the sections of the EA that addressed fertility controls. Those sections, in turn, provided citations to various studies which supported the BLM's conclusion that PZP-treatment would not affect the horses' hormone health, the behavior of treated mares, pregnancies currently in progress, or the health of offspring. Those sections also

---

[25] Plaintiffs also cite a fourth intensity factor, claiming that the gather "threatens a violation" of the Act. *See* 40 C.F.R. § 1508.27(b)(10) (listing as an intensity factor "whether the action threatens a violation of Federal, State, or local law"). This argument fails because, as discussed *supra* Part A, the Gather Plan did not violate the Act.

determined that the effects of PZP were completely reversible and that PZP could be easily administered in the field. However, the BLM's response to this comment, and the EA itself, did not address why the BLM found the studies on which it relied to be more persuasive than the Cooper and Larsen, and Nunez *et al.* studies.

Under NEPA, the panel must assess whether the BLM "failed to address certain crucial factors, consideration of which [is] essential to a truly informed decision whether or not to prepare an EIS." *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1178 (9th Cir. 1982). This issue presents a close question because, at first blush, it appears that the BLM did indeed "fail[] to address" the two studies which suggested that PZP may have detrimental effects on herd behavior and genetic diversity. The BLM did not discuss these studies, nor did the BLM explain why it decided to rely on the studies mentioned in the EA as opposed to the more recent studies cited in the comment. This fact alone, however, does not automatically lead to a NEPA violation.

First, an agency's failure to address a "certain crucial factor" in deciding whether or not to prepare an EIS is not the same as an agency's failure to address and disclaim certain evidence regarding that factor. Here, the "factor" is the effect of PZP on wild horses. The BLM *did* consider that "factor" by directing the reader to sections of the EA which addressed fertility controls and provided citations to various studies demonstrating the lack of negative effects resulting from the administration of PZP. Thus, the BLM did address the relevant factor. It simply did not write that the earlier studies rebutted Plaintiffs' speculations as to possible negative effects of PZP. Second, one could just as easily argue that the

BLM did consider the studies because it responded to the comment-at-issue by explicitly referencing the sections of the EA that addressed fertility control.  This suggests that the BLM simply did not find the newer studies to be particularly relevant or as scientifically accurate as the older studies on which it relied.[26]   Cf. *EPIC*, 451 F.3d at 1017 ("When specialists express conflicting views, we defer to the informed discretion of the agency.").

Although a close question, the latter view is more persuasive given the  impracticality of a contrary holding that would require agencies to address in detail the substance conveyed in every single comment made on an EA to prove that the agency "considered" the relevant factors.  Indeed, this court has stated that even for the more comprehensive EISs, agencies "need not respond to every single scientific study or comment."  *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 668 (9th Cir. 2009).  Moreover, "NEPA does not require federal agencies to 'assess . . . consider . . . [and] respond' to public comments *on an EA* to the same degree as it does for an EIS."  *Cal. Trout v. F.E.R.C.*, 572 F.3d 1003, 1016 (9th Cir. 2009) (emphasis added).  Therefore, we hold that, despite the fact that the BLM did not recite its reasons for relying on the studies cited in the EA as opposed to the studies cited by the comment, the BLM still performed the "hard look" required by NEPA.  *See EPIC*, 451 F.3d at 1009.

---

[26] As discussed *supra* Part B.1, the district court distinguished the two studies cited by the comment from the studies cited by the BLM on two grounds.  First, the studies cited by the comment found only "possible" negative effects of PZP.  Second, those studies assessed the effects on wild horses of repeated doses of PZP, whereas the proposed gather only administered a single dose.  *In Defense of Animals*, 909 F. Supp. 2d at 1197.

**Conclusion**

Ultimately, we conclude that the BLM acted within its authority under the Wild Free-Roaming Horses and Burros Act when it implemented the 2010 Gather Plan on the Twin Peaks HMA. We also hold that the BLM's decision not to prepare an EIS was not arbitrary and capricious because the BLM provided a convincing statement of reasons why the gather's environmental effects would not be significant. Finally, we hold that the BLM did not act arbitrarily and capriciously when it responded to comments highlighting the possibility of scientific dissent regarding the administration of the immunocontraceptive PZP. For those reasons, we **AFFIRM** the decision of the district court granting summary judgment to the Defendants.

RAWLINSON, Circuit Judge, dissenting:

I respectfully dissent because I cannot agree that the roundup of the wild horses by the Bureau of Land Management (BLM) complied with the Wild Free Roaming Horses and Burros Act (the Act).

It is undisputed that Congress enacted this legislation to *protect* wild horses and burros "from capture, branding, harassment or death" and to do so while the horses and burros are "considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331. Congress made an express finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and

enrich the lives of the American people." *Id.* Congress was concerned that "these horses and burros are fast disappearing from the American scene." *Id.* From these explicit Congressional expressions, we can discern four important legislative purposes: (1) acknowledgment of the importance of wild horses as "living symbols" of our Western heritage; (2) recognition that these treasured symbols "are fast disappearing from the American scene;" (3) articulation of Congressional policy to protect wild horses "from capture, branding, harassment or death"; and (4) designation of the area where the horses are "presently found" to accomplish the protection of the wild horses. *Id.*

With these express Congressional purposes in mind, I now consider 16 U.S.C. § 1333, the specific provision under which the BLM effectuated removal of the wild horses from their home on the range.

Pursuant to 16 U.S.C. § 1333(a), the Secretary of the Interior is directed to first protect and then to manage the wild horse population. Wild horses and burros are considered "components of the public lands" who are to be managed "at the minimal feasible level." 16 U.S.C. § 1333(a).

Section 1333(b) authorizes the Secretary to remove only "excess animals." If an overpopulation of wild horses exists, the Act mandates that any removal take place "in the following order and priority, until all *excess* animals have been removed":

> (A)  The Secretary shall order old, sick, or lame animals to be destroyed in the most humane manner possible;

(B)     The Secretary shall cause such number of *additional excess* wild free-roaming horses and burros to be humanely captured and removed [for adoption] . . . ; and

(C)  The Secretary shall cause *additional excess* wild free-roaming horses and burros for which an adoption demand . . . does not exist to be destroyed in the most humane and cost efficient manner possible.   16 U.S.C. § 1333(b)(1)–(2).

The Act couldn't be clearer.  Congress, has specifically listed the order in which excess wild horses are to be removed.  First, and before any horses are captured, "old, sick or lame animals" are "to be destroyed."  *Id.* § 1333(2)(A). Only after the first listed priority has been completed does the Act authorize "*additional excess* wild free-roaming horses and burros to be humanely captured and removed" for adoption.  *Id.*  at § 1333(2)(B).  Finally, any remaining "*additional excess* wild free-roaming horses and burros" for which no adoption demand exists may be destroyed.  *Id.*  at § 1333(2)(C).

There is absolutely no textual support in the Act for the Secretary to capture the entire herd of wild horses, excess and non-excess alike, in total disregard of the explicit priority articulated in the Act.  In addition, it cannot be gainsaid that the wholesale capture of the wild horse herd is the complete antithesis of the "minimal feasible level" of management mandated by the Act.  16 U.S.C. § 1333(a).

The majority overlooks this flagrant lack of compliance with the Act by adopting the BLM's argument that the

"gathering" of animals is not a removal governed by the provisions of § 1333(b)(2).  *Majority Opinion*, p.18–19.  However, if the BLM is not managing the excess animals pursuant to § 1333(b)(2), no other portion of the Act authorizes capture of excess horses for the purpose of removal.  And absolutely nothing in the Act authorizes the capture of non-excess horses.  The definition of removal adopted by the BLM and parroted by the majority completely ignores the Act's admonition against capturing or harassing the wild horses, and its instruction to manage the horses where they are found, as part of the public lands.  *See* 16 U.S.C. § 1331.  As stated, the BLM's interpretation allows the capture of excess and non-excess horses alike, which was clearly not the intent of the carefully crafted legislation directed toward the capture and removal of excess horses only.

If, as the BLM argues and the majority accepts, its "gather" were not contemplated by § 1333(b)(2), Congress would not have carefully crafted the priority provisions of the Act.  It is only after old, sick or lame animals are destroyed that the Act provides for additional excess wild horses to be captured.  *See* § 1333(b)(2)(A)–(B).  The BLM completely circumvented this statutory mandate and violated the express purpose of Congress to protect the wild horses from capture and/or harassment.  *See* 16 U.S.C. § 1331.  When an agency's interpretation of a statute is totally inconsistent with the express purpose of the statute, that interpretation is null and void.  *See Int'l Longshoremen's & Warehousemen's Union v. Meese*, 891 F.2d 1374, 1383 (9th Cir. 1989), *as amended* ("This court recognizes that ordinarily an agency's interpretation is entitled to deference, however, courts must reject an administrative construction of a statute that is

inconsistent with the statutory mandate or that frustrates Congress' purpose. . . .") (citation omitted).

Unlike the majority, I am not persuaded by the rationale in the district court decision of *In Defense of Animals v. Salazar*, 675 F.Supp. 2d 89 (D. D.C. 2009).  As an initial matter, that case involved the denial of a preliminary injunction and rested on a balancing of the preliminary injunction factors rather than a definitive legal ruling on the merits.  *See id.* at 95–96 (discussing likelihood of success on the merits).  More importantly, although the court purported to consider the purpose of the statute, *see id.*, it completely ignored the actual text of the statute defining its purpose as to protect the wild horses from capture or harassment and to do so where the horses were "presently found."   16 U.S.C. § 1331.

The record in this case reflects that the BLM has previously identified injured wild horses on the range without first capturing them.  Therefore, no legitimate basis existed for cavalierly chasing the horses with helicopters for miles before capturing them, including horses who were admittedly non-excess.

Under the Administrative Procedure Act, an agency abuses its discretion when its actions are contrary to law.  *See Organized Village of Kake v. U.S. Dept. of Agric.*, No. 11-35517, – F.3d –, 2014 WL 1229762 (9th Cir. Mar. 26, 2014) (articulating that "[a]n agency's action is arbitrary and capricious if . . . the agency's decision is contrary to the governing law") (citation omitted).  In my view, the BLM actions completely flouted the Wild Free-Roaming Horses and Burros Act and thereby abused its discretion.  *See id.* Because the BLM's interpretation and application of the Act

ignored the text, intent and purpose of the statute, absolutely no deference was owed to the agency action taken in reliance on that interpretation. *See Int'l Longshoremen's & Warehousemen's Union*, 891 F.2d at 1383; *see also Dyack v. Commonwealth of N. Mariana Islands*, 317 F.3d 1030, 1036 (9th Cir. 2003) ("Although we generally defer to an agency's construction of a statute it administers, we will not do so where the agency's interpretation is contrary to the legislative intent. . . .") (citation omitted).

I respectfully dissent.