**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

JUL 2 2020

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| FRIENDS OF ANIMALS, | No. 18-17415 |
| Plaintiff-Appellant, | D.C. No. 3:18-cv-00043-LRH-CBC |
| v. | |
| JILL SILVEY, in her official capacity as the Elko District Office Manager; BUREAU OF LAND MANAGEMENT, | MEMORANDUM* |
| Defendants-Appellees. | |

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted April 29, 2020
San Francisco, California

Before: GILMAN,** GRABER, and COLLINS, Circuit Judges.

Plaintiff Friends of Animals appeals from the summary judgment entered in

favor of Defendants Jill Silvey, in her official capacity as the Elko District Office

Manager, and the Bureau of Land Management ("BLM") in an action challenging

---

*        This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

**        The Honorable Ronald Lee Gilman, United States Circuit Judge for
the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

BLM's Antelope and Triple B Complexes Gather Plan ("Gather Plan"). Plaintiff brought claims that BLM violated the Wild Free-Roaming Horses and Burros Act, the Administrative Procedure Act, and the National Environmental Policy Act ("NEPA"). Reviewing de novo a district court's grant of summary judgment, McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1112 (9th Cir. 2004), and reviewing under the Administrative Procedure Act's arbitrary-and-capricious standard allegations of NEPA violations, Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1238 (9th Cir. 2005), we affirm.

1. BLM was not required to prepare an environmental impact statement. We refer the parties to our opinion in American Wild Horse Campaign v. Bernhardt, No. 18-17403, for a complete discussion of this issue.

In addition, BLM's decision not to prepare an environmental impact statement because of the boundary correction was not arbitrary and capricious. Unlike the Forest Service in American Wild Horse Preservation Campaign v. Perdue, 873 F.3d 914 (D.C. Cir. 2017), BLM acknowledged the change, considered its effect, and explained why the Gather Plan did not need to be adjusted in light of the correction.

2. BLM satisfied the "hard look" standard regarding the effects of releasing geldings back to the range. Envtl. Prot. Info. Ctr. v. U.S. Forest Serv., 451 F.3d

2

1005, 1009 (9th Cir. 2006).  The environmental assessment provides a thorough review of the research on the gelding procedure and of studies on the effects of gelding on domesticated and semi-feral horses, on the effects of castration on other species, and on the natural social behavior of wild horses.  Although BLM did not address the National Academy of Sciences Report directly, it provided a "reasoned evaluation of the relevant factors."  Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, 273 F.3d 1229, 1236 (9th Cir. 2001) (citation and internal quotation marks omitted).  BLM acknowledged the uncertainty that the report identified and discussed the evidence of potentially adverse effects of gelding.  BLM also addressed the factors raised by experts who submitted public comments and provided a reasonable explanation for not relying on their opinions.  See In Def. of Animals v. U.S. Dep't of Interior, 751 F.3d 1054, 1072 (9th Cir. 2014) (holding that agencies are not required to "address in detail" every comment made on an environmental assessment "to prove that the agency 'considered' the relevant factors").  BLM then permissibly made "reasonable predictions on the basis of prior data" to conclude that there would be no significant environmental impact. Ctr. for Biological Diversity v. Kempthorne, 588 F.3d 701, 712 (9th Cir. 2009).

3.  BLM also satisfied the hard-look standard regarding the effects of the Gather Plan on genetic diversity.  The Gather Plan complies with BLM's

3

guidelines. It includes a process to continue to monitor and assess diversity and to mitigate concerns about genetic diversity. Additionally, in the environmental assessment, BLM discussed the effects of gelding and the administration of immunocontraceptives on genetic diversity. Because unique genotypes are not at issue here and because most herds have high genetic variability, BLM considered the necessary factors to satisfy the hard-look standard. Cf. Friends of Animals v. U.S. Bureau of Land Management, No. 16-cv-0199, 2017 WL 5247929, at *8 (D. Wyo. Mar. 20, 2017) (concluding that BLM had sufficiently addressed the concern of general genetic variability, but that it had not adequately discussed the effects on a unique genotype).

4. BLM's choice to conduct a continuous removal of geldings through a phased-gather approach was not arbitrary or capricious. BLM's use of a single gather plan and a single environmental assessment to cover a period of years and a series of individual gather operations is not a departure from the agency's past practice. See, e.g., Leigh v. Salazar, No. 3:13-cv-00006, 2014 WL 4700016 (D. Nev. Sept. 22, 2014) (approving a 10-year phased-gather plan for Owyhee Complex using a single environmental assessment). The statements in the land-use plans and guidebook are not in conflict with BLM's decision because BLM has used the term "gather" to refer to both individual gather operations and gather

4

plans. Finally, BLM's choice does not conflict with litigation positions that BLM has taken in the past. In Friends of Animals v. Haugrud, 236 F. Supp. 3d 131 (D.D.C. 2017), BLM argued that the plan at issue authorized a single roundup only and that additional environmental assessments would be required before conducting any other roundups. Id. at 134–35. BLM did not take the position, however, that plans can never authorize multiple roundups. Because the Gather Plan does not reflect a policy change, the Administrative Procedure Act does not require BLM to provide an explanation. Cf. Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2125 (2016) (holding that agencies are free to change their policies as long as they provide a reasoned explanation).

5. The Wild Free-Roaming Horses and Burros Act requires BLM to use "currently available" information to make the determination that there is an excess population of wild horses and that action must be taken. 16 U.S.C. § 1333(b)(2). Plaintiff argues that the Gather Plan fails to base decisions to remove horses on current information because BLM will remove horses over the course of the next ten years using information that is not currently available. But the "current information" requirement in the Act applies only to the determination that an excess exists and that action must be taken. Id. The Act's current-information requirement does not apply to BLM's choice-of-removal method. See In Def. of

5

Animals, 751 F.3d at 1065 & n.16 (noting that BLM has broad discretion in deciding how to remove excess horses). Here, BLM chose to address the single overpopulation determination gradually, over the course of ten years, through a series of gathers. Because BLM founded its 2017 excess-population determination on currently available information, it complied with the requirements of the Act.

**AFFIRMED.**